1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CATHERINE CAMPBELL,<br><br>    Plaintiff,<br><br>  v.<br><br>JANET YELLEN,<br><br>    Defendant. | CASE NO. 2:23-cv-00637-JHC<br><br>ORDER GRANTING MOTION FOR<br>SUMMARY JUDGMENT |

# I

## INTRODUCTION

This employment matter comes before the Court on Defendant's Motion for Summary Judgment. Dkt. # 36. Plaintiff Catherine Campbell alleges that Defendant, her former employer, created a hostile work environment and engaged in acts of employment discrimination and retaliation. *See generally* Dkt. # 1. Defendant seeks summary judgment, contending that Plaintiff's claims fail as a matter of law. Dkt. # 36. Because Plaintiff does not make a prima facie case for any of her claims, the Court GRANTS Defendant's motion.

//

//

ORDER GRANTING MOTION FOR SUMMARY
JUDGMENT - 1

## II

### BACKGROUND

A.    Factual Background

    1.    Tension between Plaintiff and her supervisor

Plaintiff was born in 1946, and she started working as an attorney in the IRS Chief Counsel's Office (IRSCC) in 1984.  Dkt. # 37-1 at 2, 8.  In her nearly 35 years of service, she never faced performance-related discipline and won several awards for high quality work during her tenure.  *Id.* at 2.  She was also generally evaluated as "fully successful" over the course of her career.  Dkt. # 37-3 at 5:4–7.

But Plaintiff's experience at work soured after March 2018, when a new supervisor, Melissa Lang, was appointed to oversee the office where she worked.  Dkt. # 37-1 at 27.  Lang came from a different division that resolved large cases with corporate employers.  Dkt. # 40 at 3.  Not long after arriving, Lang had concerns with Plaintiff's work.  Dkt. # 37-1 at 54.  And she informed Plaintiff, both orally and in writing, of these concerns.  *Id.*  When Lang reviewed Plaintiff's work, she routinely offered comments, left suggestions, and noted necessary revisions.  *Id.*  According to Plaintiff, it then took her longer to complete her work because she needed to address these "erroneous corrections and changes[.]"  *Id.* at 2.

Plaintiff's relationship with Lang, however, began to deteriorate further in early 2019.  *See* Dkt. # 37-3 at 6:7–9.  At the time, Plaintiff had a new granddaughter, and she was often asked to babysit during weekday hours.  Dkt. # 40 at 4–5.  She submitted a standing request to telework on Wednesdays (and the occasional Friday) because she "need[ed] to help with the baby."  Dkt. # 37-1 at 21.  Lang told Plaintiff that she would coordinate with management and determine whether her standing request for telework would be granted.  *Id.* at 22.  When Plaintiff followed up with Lang about this request, Lang informed her that it was denied.  *Id.* at 75.  Lang

instructed Plaintiff to "use our established process of requesting leave and telework in advance by sending me an Outlook calendar event. Per usual, your requests will be considered in light of the workload/staffing needs that arise in the office." *Id.* at 76.

On April 16, 2019, Plaintiff asked Lang if she could earn 1.5 "credit hours" for that day. *Id.* at 23.[1] But Lang did not approve this request because she thought the work that Plaintiff intended to do could be finished during regular work hours. *Id.* Plaintiff responded and said,

> All I am doing is working 40 hours a week with small timing adjustments that enable me to care for my granddaughter as the family needs my help. Instead of working 5.5 or 6 hours of my tour of duty on Wednesdays, I work those hours in 1.5 [hour] increments on the [remaining] days of the week.

*Id.* When Plaintiff's Union Steward talked to Lang about this credit hour denial, he noted that Plaintiff "just wants to take care of her granddaughter" and that she should be entitled to "flexibility in her personal life." *Id.* at 73. Lang later reiterated that Plaintiff would need to request and receive approval before working credit hours. *Id.* at 76. Lang also required Plaintiff to include in her request "the number of hours you are requesting, when you plan to work them, and what you plan to work on." *Id.*

Later in April 2019, there were two instances when Lang could not contact Plaintiff at work. *Id.* at 74–75. On the second occasion, Lang messaged Plaintiff on Lync (the IRSCC internal messaging platform) during her core hours and Plaintiff did not respond. *Id.* at 75. Lang expressed concern that Plaintiff was not covering her core hours and said, "I would appreciate it if you could assuage those concerns through promptly responding to my messages while you are

---

[1] Credit hours are "any hours within the flexible band which are in excess of an employee's basic work requirement and which the employee works, with supervisory approval, so as to vary the length of the workweek or workday." Dkt. # 37-1 at 24. Said differently, so long as a supervisor granted prior approval, earning credit hours gave IRSCC employees more flexibility in their work schedule and allowed them to work a few extra hours one day so they could work less on a different day. *Id.* Ad hoc, daily schedule changes were also allowed, but only if approved by management and these changes were "subject to workload requirements." *Id.* IRSCC employees also needed to work "core hours." *Id.*

on scheduled telework." *Id.*  Plaintiff responded that her "absence was inadvertent" and that she "always try[s] to be attentive" while teleworking.  *Id.*  After several other instances when Lang could not contact Plaintiff during work hours, Lang emailed her and said, "I would like you to keep [me] appraised of your comings and goings in the office and while teleworking.  Please send me an email when you begin work and when you leave for the day."  *Id.* at 15; *see id.* at 76–78, 81–84.

Another source of friction between Plaintiff and her supervisor was timekeeping.  *See id.* at 76.  In one instance, Lang noticed Plaintiff's timesheet did not match her pre-approved telework, so Lang said she would not approve "time in the future to the extent it does not match with what I have pre-approved."  *Id.* at 77.  Plaintiff responded with an explanation and said she was concerned that Lang would ever think that she did not work her mandated hours.  *Id.*  In another instance, Plaintiff requested 17 hours of travel compensatory time after a business trip to Florida, but Lang approved only 14.25 hours.[2]  Dkt. # 37-2 at 48.  Plaintiff maintains that she was granted fewer hours because Lang scrutinized "each component of the time report in an effort to discover errors," but she also concedes that an "insignificant error" was found in the calculation of the travel time.  *Id.* at 2.  Lang says that she "carefully reviewed" Plaintiff's request but adds that she reviewed the request in the same manner she reviews all the information and documents submitted to her.  *Id.* at 48.

Plaintiff and Lang also clashed over correspondence to taxpayers.  *See id.* at 35–37.  In September 2019, Plaintiff sent an error-filled letter that included "an incorrect docket number, incorrect phone number, a type over on the office letter head, and an incorrect office-identifier."  *Id.* at 38.  Lang only received a copy of the letter after it was sent and could not correct the

---

[2] Travel compensatory time allows IRSCC employees to be compensated for time spent traveling on official business.  Dkt. # 37-2 at 47.

errors. *Id.* Afterward, Lang required Plaintiff to submit all her work for review before it was filed or mailed. *Id.* Only a few weeks later, Plaintiff submitted a letter to Lang that contained the wrong zip code, the wrong docket number, the wrong office number, and other mistakes. *Id.* at 13–14. Lang required Plaintiff to fix these errors. *Id.*

In November 2019, Plaintiff emailed Lang, saying that she had emailed a taxpayer to confirm his address. *Id.* at 18. Lang became concerned that this email violated office policy about permissible email communications with taxpayers. *Id.* This concern was made even worse because Lang had orally counseled Plaintiff regarding this policy two other times in recent months. *Id.* at 19. Lang had also sent Plaintiff a copy of this office policy a few months prior, along with follow-up emails to memorialize their discussions. *Id.*[3] After conferring with her supervisors, Lang issued Plaintiff a written reprimand in February 2020 "because of a failure to follow supervisory directions." *Id.* at 4, 20.

Only two weeks after she received her first written reprimand, Plaintiff sent another email that violated multiple office policies. *Id.* at 25–26. This email contained information that was not allowed to be shared with taxpayers and included a taxpayer's Personally Identifiable Information (PII). *Id.* at 29–30. Lang then issued Plaintiff an official reprimand in March 2020. *Id.* at 7. As a result of this reprimand, Plaintiff was prevented from teleworking for six months, but "due to the Covid-19 pandemic and the telework flexibilities put into place by the Office of Chief Counsel, [Plaintiff]'s six-month suspension of telework [was] deferred indefinitely." *Id.* at 29.

Along with these written reprimands, Plaintiff was not assigned to an Examination Group in April 2020 based on a different supervisor's issues with her work. *Id.* at 52. The Examination

---

[3] Plaintiff asserts that some of this counseling was unwarranted because the office policy was not circulated until after she sent at least some of these messages. Dkt. # 40 at 7.

Groups support IRS collection and examination agents by attending meetings, answering questions, and providing training. *Id.* at 55. Diane Wittman—a different supervisor—requested that Plaintiff not be assigned to her groups. *Id.* at 75. This request was made after receiving complaints about Plaintiff's lack of responsiveness, helpfulness to clients, and professionalism in communications. *Id.* at 54. Despite not being assigned to a group for the previous two years, Plaintiff still asked why she was not included this time, writing "I DID NOT SEE THAT I AM ASSIGNED TO ANY EXAM GROUPS. WHY?" *Id.* at 71. Lang then drafted a response with another supervisor that sought to explain the situation. *Id.* at 70.

       2.     Workplace evaluations

Plaintiff's workplace evaluations memorialize the change in Lang's assessment of her work product over time. At first, Lang rated Plaintiff as "fully successful" in her fiscal year 2018 evaluation, but she quickly started to notice issues with Plaintiff's work. *See* Dkt. # 37-1 at 54–55. Lang then issued Plaintiff a midyear assessment in November 2018 where she "indicated several areas in which [Plaintiff] needed to improve." *Id.* at 54.

In May 2019, Lang sent her supervisor, Peter Hochman, Plaintiff's next annual evaluation. *Id.* at 99. This evaluation again provided a summary rating of "fully successful."[4] *Id.* But there were "several areas needing improvement" and it was noted "that maintaining or improving the current ratings required improvement." *Id.* After Lang sent him the evaluation, Hochman reviewed and approved it. *Id.* Lang then shared the evaluation with Plaintiff. *Id.* And Plaintiff signed it. *Id.*

---

[4] In her EEO complaint, Plaintiff described this appraisal "as an indication of an intent to classify her work as unsatisfactory." Dkt. # 37-1 at 8. But the record shows her "SUMMARY RATING" in this appraisal is listed as "Fully Successful" and her "Element Rating" is "Exceeds" or "Meets" for all elements. *Id.* at 100.

Six months later, Lang gave Plaintiff another midyear evaluation.  Dkt. # 37-2 at 80.

This assessment noted "serious issues" with Plaintiff's performance.  *Id.*  And Lang wrote that if

this were "a rating of record," Plaintiff's overall summary rating would only be "Minimally

Acceptable."  *Id.*  But Lang added that she was bringing these performance problems to

Plaintiff's attention so that she would have a chance to correct them.  *Id.* at 90.  And Lang told

Plaintiff, "I am available to help you in this regard."  *Id.*

        3.      EEO Actions

In May 2019, Plaintiff contacted an EEO counselor.  Dkt. # 37-1 at 3.  On her intake

form, she noted that she was discriminated against based on her age and osteoarthritis disability.

*Id.* at 4.  She also shared that she sought a reasonable accommodation because she needed "to

work certain hours and credit hours" to complete her work and because she wanted to continue

her work "free from Manager Lang's harassment."  *Id.* at 5.

A few weeks later, an EEO counselor arranged to interview Lang about Plaintiff's

complaint.  *Id.* at 29.  Lang says that she first learned of Plaintiff's osteoarthritis disability during

this interview with the EEO counselor, and that this was the first time she learned Plaintiff's

disability impaired her ability to type.  *Id.*  But Plaintiff maintains that she told Lang about her

disability even before Lang became her manager.  Dkt. # 37-3 at 8:21–9:15.

In July 2019, Plaintiff submitted a Reasonable Accommodation (RA) request to Keona

Hill, an EEO Specialist in the IRSCC office.  Dkt. # 37-1 at 90–91.  Plaintiff's requested

accommodations were: (1) "approval to work credit hours" and (2) to have her work "reviewed

in paper format."  *Id.* at 62.  Plaintiff described the medical reason for her requested

accommodation as "I suffer from osteoarthritis, which makes typing difficult."  *Id.*  Hill,

Hochman, Lang, and Plaintiff then met to discuss Plaintiff's RA request.  *Id.* at 94.  Plaintiff

explained that she sought to work credit hours on Saturdays so that she would have fewer

ORDER GRANTING MOTION FOR SUMMARY
JUDGMENT - 7

distractions. *Id.* at 96. And she wanted to have her work reviewed on paper because it was "stressful to review an entire document that is marked up with track changes." *Id.* at 97. In response, Plaintiff was offered a larger, high-resolution monitor and voice recognition software to eliminate some typing. *Id.* at 97–98. Plaintiff said she would try the voice recognition software but did not need the monitor. *Id.* She also declined additional training on track changes because "the content in track changes [was] the underlying problem." *Id.* at 98.

The next month, Plaintiff submitted a sworn EEO affidavit that expanded on her credit hour accommodation request. *Id.* at 12. According to Plaintiff, "the denial of my earning and using credit hours is not a 'reasonable accommodation' request as an hour earned and an hour used is only one hour worked; so, it does not afford more time for an employee to complete the task." *Id.* And Plaintiff stated that Lang's denial of her credit hours requests "exhibited bias, discrimination, and retaliation" because it denied Plaintiff the "benefit of a flexible schedule." *Id.* at 13.

In September 2019, Hill, Hochman, Lang, and Plaintiff had another meeting to discuss Plaintiff's RA requests. *Id.* at 36. Management explained that her request to use credit hours as a reasonable accommodation was denied because "it would not effectively address her concerns that her arthritis was slowing down her ability to generate type-written work." *Id.* at 64. But Plaintiff could still earn credit hours so long as her manager approved. *Id.* Plaintiff's request to have her work reviewed in paper format was similarly denied because "it lacked nexus to [her] osteoarthritis condition." *Id.* Management also noted that this accommodation was not appropriate because "it was designed to lower the standard by which her work was reviewed, rather than to accommodate her medical condition." *Id.* In her response to these denials, Plaintiff reiterated that the underlying reason she sought to use credit hours was "to take advantage of the benefits of flexibility in [her] work schedule[.]" *Id.* at 66. She added that her

request to have her work reviewed on paper was mainly because the "constant rejection" of her work was stressful and because "in most instances, Ms. Lang's attempted justifications [for suggested changes] were inappropriate, wrong, unnecessary, or merely stylistic." *Id.* at 67.

Plaintiff filed a second EEO complaint in April 2020. Dkt. # 11-2 at 2. In this complaint, she alleged that she was subject to discrimination and harassment in retaliation for her prior EEO protected activity. *Id.* at 15. But the United States Department of the Treasury found no discrimination or harassment when it issued its Final Agency Decision. Dkt. # 11-3 at 1–11. Plaintiff then retired in November 2020. Dkt. # 11-7 at 36. She filed her third and final EEO complaint in February 2021, alleging constructive discharge, discrimination, and retaliation. *Id.* at 2–4, 8.

B.    Procedural History

Plaintiff filed this case on May 1, 2023. Dkt. # 1. Defendant then moved for partial judgment on the pleadings. Dkt. # 10. The Court granted this motion and dismissed Plaintiff's constructive discharge claims and the claims of discrimination and retaliation in her third EEO complaint because these claims were time barred. Dkt. # 27 at 21.[5] Plaintiff's motion for reconsideration, Dkt. # 28, was denied. Dkt. # 31.

Plaintiff's remaining claims are (1) disparate treatment and hostile work environment in violation of the Age Discrimination in Employment Act (ADEA), *see* 29 U.S.C. § 621 *et seq.*; Dkt. # 1 at 6–7 ¶¶ 6.1–6.8; (2) disparate treatment, hostile work environment, and failure to accommodate in violation of the Rehabilitation Act of 1973, *see* 29 U.S.C. § 701 *et seq.*; Dkt. # 1 at 7 ¶¶ 7.1–7.8; and (3) retaliation and disparate treatment in violation of 29 U.S.C. §§ 794, 633a;

---

[5] In this order, the Court granted Plaintiff leave until September 30, 2024 to file an amended complaint. Dkt. # 27 at 21. Plaintiff attaches an amended complaint to her response to Defendant's motion for summary judgment, *see* Dkt. # 39-1, but the Court does not consider the contents of this complaint because it is untimely.

1    Dkt. # 1 at 8–9 ¶¶ 8.1–8.6.  Defendant seeks summary judgment dismissal of these claims.  Dkt.

2    ## 36, 42.

3                                              **III**

4                                          **DISCUSSION**

5            Summary judgment is warranted if the evidence, viewed in the light most favorable to the

6    non-moving party, shows "that there is no genuine dispute as to any material fact and the movant

7    is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*,

8    477 U.S. 317, 322 (1986).  A fact is "material" if it might affect the outcome.  *Anderson v.*

9    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is

10   sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out*

11   *Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248–49).

12           The moving party bears the initial burden of showing there is no genuine dispute of

13   material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  To

14   carry its burden "the moving party must either produce evidence negating an essential element of

15   the nonmoving party's claim or defense or show that the nonmoving party does not have enough

16   evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire*

17   *& Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party meets

18   its burden of production, the burden shifts to the nonmoving party to identify specific facts from

19   which a factfinder could reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at

20   324; *Anderson*, 477 U.S. at 250; *see also Gov't Emps. Ins. Co. v. Nadkarni*, 477 F. Supp. 3d

21   1091, 1096 (N.D. Cal. 2020), *aff'd*, 842 F. App'x 172 (9th Cir. 2021) ("The non-moving party

22   may not rest upon mere allegations or denials of the adverse party's evidence, but instead must

23   produce admissible evidence that shows there is a genuine issue of material fact for trial.").

24   *//*

ORDER GRANTING MOTION FOR SUMMARY
JUDGMENT - 10

A.    Failure to Accommodate

To establish a prima facie case for failure to accommodate, Plaintiff must show (1) she is disabled; (2) she was qualified and able to perform the essential functions of her job with a reasonable accommodation; and (3) she suffered an adverse employment action due to her disability.[6]  *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012). To survive summary judgment, a plaintiff need only show that the accommodation "seems reasonable on its face, *i.e.,* ordinarily or in the run of cases."  *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).

The Ninth Circuit also requires an employer notified of the need for an accommodation "to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee."  *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018).  Discrimination results when an employer denies "an available and reasonable accommodation."  *Id.*  But "[a]n 'employer is not obligated to provide an employee the accommodation [she] requests or prefers, the employer need only provide some reasonable accommodation.'"  *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (quoting *E.E.O.C. v. Yellow Freight Sys. Inc.,* 253 F.3d 943, 951 (7th Cir. 2001) (en banc)).

The parties' argument centers on whether Defendant denied Plaintiff a reasonable and available accommodation.  Plaintiff says she was denied two such accommodations: (1) the

---

[6] The Court evaluates Plaintiff's claims under the Rehabilitation Act using caselaw that interprets both the ADA and the Rehabilitation Act because the latter "incorporates the 'standards' of Title I of the ADA for proving when discrimination in the workplace is actionable[.]"  *Fleming v. Yuma Reg'l Med. Ctr.,* 587 F.3d 938, 939 (9th Cir. 2009); *see Yonemoto v. McDonald*, 114 F. Supp. 3d 1067, 1111 (D. Haw. 2015), *aff'd*, 725 F. App'x 482 (9th Cir. 2018).

ability "to work credit hours"; and (2) to have her work "reviewed in paper format." Dkt. # 38 at 14; Dkt. # 37-1 at 61.

Defendant responds that these proposed accommodations were unreasonable because they are unrelated to Plaintiff's disability, osteoarthritis. Dkt. # 37 at 13–14. Defendant says that working credit hours would not address Plaintiff's "concerns that her arthritis was slowing down her ability to generate type-written work" because—as she repeatedly stated, including in a signed affidavit—"using credit hours is not a 'reasonable accommodation' request as an hour earned and an hour used is only one hour worked; so, it does not afford more time for an employee to complete the task." Dkt. # 37-1 at 12; *see id.* at 65–66. Plaintiff also could not explain the connection between her osteoarthritis and working credit hours at her deposition. Dkt. # 37-3 at 10:5–21. And the record shows Plaintiff asked to use credit hours not because of her arthritis but because she sought "to take advantage of the benefits of flexibility in [her] work schedule" and because she "need[ed] to help" with her granddaughter. Dkt. # 37-1 at 21, 66.

The record similarly shows Plaintiff's request to have her work reviewed on paper was not connected to her disability. She wanted "her reviewer to make handwritten revisions to her documents because that will limit the number of changes her reviewer makes." *Id.* at 63. And she sought to have her work reviewed on paper because "track changes can be difficult to read" and because "she finds it stressful to see so many red lines in her documents and it gets overwhelming." *Id.* In her formal EEO complaint, Plaintiff simply wrote that tracked changes are "overwhelming and not productive." *Id.* at 67. At her deposition, she was asked, "How would receiving changes in writing instead of tracked changes have reduced the amount that you had to write?" Dkt. # 37-3 at 22:2–5. Plaintiff could only respond, "I don't know." *Id.*

Although Defendant did not grant the accommodations that Plaintiff requested, the parties still engaged in an interactive process to find a reasonable accommodation. Defendant

met with Plaintiff to explain why her requested accommodations were not reasonable.  Dkt. # 37-1 at 63.  Defendant then proposed installing voice recognition software on her computer and using ergonomic office equipment.  *Id.*; Dkt. # 40 at 8.  Plaintiff accepted these alternative accommodations.  Dkt. # 37-1 at 36.  Plaintiff says she never had a working version of the dictation software, but she also admits Defendant "made [its] best effort" to install the software for her and Defendant did not finish installing the software only because she retired.  Dkt. # 37-3 at 14:14–15:7, 16:3–5.  Plaintiff further concedes that Defendant supplied her with ergonomic office equipment, including "several different keyboards and mice[.]"  Dkt. # 40 at 8.

This claim does not survive summary judgment because Plaintiff does not raise a triable issue of fact.  Plaintiff has provided no evidence that shows her requested accommodations were reasonable on their face; they were not connected to her disability.  The record also shows Defendant engaged in the interactive process and worked with Plaintiff to find a reasonable accommodation that would fit her needs.  Thus, Plaintiff has failed to show a specific reasonable accommodation that Defendant failed to provide, and she does not carry her burden of showing that the accommodations offered by Defendant were unreasonable.  *Memmer v. Marin Cnty. Cts.*, 169 F.3d 630, 633–34 (9th Cir. 1999).

B.    Disparate Treatment

Claims of disparate treatment are analyzed under the burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  This framework requires Plaintiff to first establish a prima facie case by showing (1) she belongs to a protected class; (2) she was qualified for her position; (3) she experienced an adverse employment action; and (4) similarly situated employees that are not in her protected class received more favorable treatment.  *Id.* at 802; *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018).  If Plaintiff makes her prima facie case, the burden shifts back to Defendant "to articulate a legitimate,

nondiscriminatory reason for the challenged conduct." *Campbell*, 892 F.3d at 1012. If

Defendant does so, the burden shifts back to Plaintiff to show "that the reason offered is

pretextual." *Id.*

It is undisputed that Plaintiff belonged to a protected class and was qualified for her

position. She says that she faced several adverse employment actions:

- management reprimanded her after she disclosed a taxpayer's Personally Identifiable Information (PII);
- management issued her a written reprimanded because she disclosed PII in another instance;
- her ability to telework was suspended;
- she had to use her Lync Communication System while in the office;
- her request to use credit hours as a reasonable accommodation was denied; and
- she was repeatedly berated by her manager and called unprofessional.

Dkt. # 37-1 at 8; Dkt. # 37-3 at 3. Plaintiff purports to identify three comparator employees—

Ara DerHartonian, Patsy Clark, and Dan Kempland—attorneys in her office, who reported to the

same supervisor and were not subject to the same or similar adverse conduct. Dkt. # 37-3 at 2.

But she can only offer her "best estimate" about the age of these employees, and she does not

provide any evidence about their disability status. Dkt. # 37-4 at 13–14. And Plaintiff

repeatedly distinguishes herself from these employees, saying that they "have significantly less

experience at the IRS," and provides virtually no evidence to show these employees had similar

job responsibilities or engaged in similar conduct. *See id.* at 13–18.

In response, Defendant says that Plaintiff fails to make her prima facie case. Dkt. # 38 at

16. Defendant says the incidents identified by Plaintiff are not "adverse employment actions"

because they did not change the terms and conditions of her employment. *Id.* at 16–17. And

Defendant contends Plaintiff does not identify a similarly situated employee outside of her

protected class that was treated more favorably. *Id.* Defendant also identifies evidence that

shows it had a legitimate, nondiscriminatory motive for the actions it took against Plaintiff. *Id.* at 18–20.

Even viewed in the light most favorable to Plaintiff, her evidence does not establish a prima facie case of disparate treatment. She does not point to a similarly situated employee treated more favorably by Defendant but who is not in her protected class. The only instance in the record when Plaintiff and a comparator employee engaged in similar conduct occurred in September 2019. Dkt. # 37-2 at 28. Dan Kempland disclosed PII in an email to the Department of Justice. *Id.* But Plaintiff and Kempland received the same discipline when they sent an email containing PII for the first time—informal counseling. *Id.* at 18, 28–29. The record does not show Defendant's treatment of the comparator employees was more favorable than its treatment of Plaintiff.

C.    Hostile Work Environment

To establish a prima facie hostile work environment claim, Plaintiff must raise a triable issue of fact as to whether (1) she was "subjected to verbal or physical conduct" because of her membership in a protected class; (2) "the conduct was unwelcome"; and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (quoting *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 817 (9th Cir. 2002)).

Courts determine whether a workplace was abusive "by looking at all the circumstances," including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Courts must also evaluate whether the workplace was both subjectively and objectively hostile.

*Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000).  To assess the objective portion of the claim, courts "assume the perspective of the reasonable victim."  *Id.*

Plaintiff describes several instances that she alleges combined to create a hostile work environment.  One time, her manager scrutinized her travel documentation for business-related travel.  Dkt. # 37-4 at 14.  She was later called into her manager's office and reprimanded for requesting a taxpayer's phone number in violation of Defendant's email policy.  *Id.* at 14-15.  Plaintiff had her telework privileges revoked and was issued a written reprimand in another instance because she again requested a taxpayer's phone number over email, but this reprimand was similarly unwarranted because the request was "inadvertently" attached to her email.  *Id.* at 15.  Plaintiff's manager later prohibited her from signing off on correspondence and pleadings without having her work reviewed—a privilege she would have otherwise enjoyed based on her seniority.  *Id.* at 16.  And Plaintiff was not allowed to use credit hours, which denied her a flexible work schedule.  *Id.* at 17.

In addition, Plaintiff's supervisor was condescending, dismissive, and threatening.  *Id.* at 14–15.  Plaintiff had to send her manager daily emails with "the time of all of [her] movements during a workday."  *Id.* at 17.  And these events eventually came to a head when Plaintiff emailed her manager, "I do not understand why you are all of a sudden micromanaging my ability to control my work production.  When You [sic] are killing me.  I have never been treated like this.  When I was allowed the reasonable flexibility of working credit hours, I always got my work to you early."  Dkt. # 40-1 at 12.

Defendant responds that Plaintiff's prima facie case fails here too.  Defendant maintains that Plaintiff does not show her manager's conduct was due to her age or disability.  Dkt. # 36 at 21.  Plaintiff identified other, nondiscriminatory motives for her manager's actions, including "lack of knowledge," "lack[] of prior experience," and unfamiliarity with the "issues at hand."

*Id.* at 21–22; *see* Dkt. # 37-1 at 16–18.  At her deposition, Plaintiff acknowledged that one of the reasons for her manager's conduct could have been a genuine disagreement with her work.  Dkt. # 37-4 at 23:23–27:14.  And when asked why she believed her manager's action were because of bias, she said, "I have no idea."  *Id.* at 27:11–14.

Defendant further contends that Plaintiff does not show the harassment she suffered was severe or perverse enough to establish a hostile work environment claim.  Dkt. # 36 at 23.  Defendant lists several cases that it says show Plaintiff's allegations "do not meet the demanding standard for a hostile work environment as a matter of law."  *Id.*  And, according to Defendant, Plaintiff's subjective experience cannot show a hostile work environment because she does not show that her manager's conduct was objectively abusive.  *Id.* at 24.

Plaintiff does not raise an issue of fact as to whether her workplace was objectively hostile.  Generally, "[o]stracism, micromanagement, and discipline" do not inherently support a hostile work environment claim.  *Edgell v. Regan*, 2023 WL 8702058, at *16 (W.D. Wash. Dec. 15, 2023) (collecting cases).  And the difficulties that Plaintiff describes "are the kinds of normal strains that can occur in any office setting."  *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004); *see Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context.").  The record simply does not reflect the conduct required to survive summary judgment on a hostile work environment claim.  *See, e.g.*, *Vasquez v. Cty. of Los Angeles,* 349 F.3d 634, 643–44 (9th Cir. 2003) (holding two racial epithets directed at the plaintiff and other harassing conduct could not create a hostile work environment); *Sanchez v. City of Santa Ana,* 936 F.2d 1027 (9th Cir. 1990) (upholding directed verdict that dismissed hostile work environment claim where employer posted a racially offensive cartoon,

used racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino); *Mangaliman v. Wahington State DOT*, 2014 WL 1255342, at *10 (W.D. Wash. Mar. 26, 2014) (dismissing hostile work environment claim despite allegations the plaintiff was called "dumb Filipino," his supervisor "chew[ed] [him] out," supervisors "scrutinize[ed] his conduct," and he faced "extensive performance testing.").

The Court appreciates that Plaintiff was unhappy in her work environment and that she may sincerely believe she was treated unfairly.  But the record does not show that the conduct at issue was severe or pervasive enough to rise to a cognizable hostile work environment claim.

D.    Retaliation

Retaliation claims are also analyzed under the *McDonnell Douglas* burden shifting framework.  *See Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 693 (9th Cir. 2017).  To make her prima facie case, Plaintiff must show (1) "that she undertook a protected activity"; (2) "[her] employer subjected [her] to an adverse employment action"; and (3) "there is a causal link between those two events."  *Id.* (quoting *Vasquez*, 349 F.3d at 646).  "[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."  *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir. 2000).

If Plaintiff makes her prima facie case, the burden shifts to Defendant to provide a legitimate, nonretaliatory reason for the adverse employment action it took.  *Reynaga*, 847 F.3d at 693.  If Defendant meets this burden, then Plaintiff "has the ultimate burden of showing that [Defendant's] proffered reasons are pretextual."  *Id.* (quoting *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994)).

Plaintiff identifies only one thing that ties her protected activity to the adverse employment actions she suffered: timing.  Dkt. # 38 at 23.  She says, "Timing is enough to infer

retaliation." *Id.* (citing *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865 (9th Cir. 2003)).  And she contends that here "a jury could find that when Ms. Campbell raised concerns about the alleged justification for Ms. Lang's actions, she was forced to elevate her concerns to a formal complaint process because of the inadequate response." *Id.* at 23.  But Plaintiff does not point to evidence that shows any proximity between the time when she filed her EEO complaint (i.e., engaged in a protected activity) and an adverse action by her employer.  *See id.*

On the other hand, Defendant shows several months elapsed between Plaintiff's EEO complaint and the claimed adverse employment actions. Dkt. # 36 at 26.  Defendant adds that the events Plaintiff complains about are "too far removed" from her EEO complaint "to show causation." *Id.*  The record shows that Plaintiff's supervisor learned about her EEO complaint on June 5, 2019. Dkt. # 37-2 at 1.  Several events that Plaintiff identifies as adverse employment actions occurred before this.  For instance, Plaintiff was issued a mid-year assessment that identified deficiencies in her work seven months before, Dkt. # 37-1 at 86; Plaintiff's supervisor denied her credit hours request seven weeks earlier, *id.* at 71–72; and the proposed annual appraisal of Plaintiff that found she failed to improve in the areas identified in her mid-year assessment was sent a month prior, *id.* at 99.  Defendant correctly notes these events, which occurred before the protected activity, "cannot logically have been caused by that protected activity."  Dkt. # 36 at 25; *see Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000) ("[W]hen adverse employment decisions are taken within a reasonable period of time *after* complaints of discrimination have been made, retaliatory intent may be inferred.") (emphasis added).

The other events that Plaintiff identifies occurred months after her EEO complaint was filed.  The record shows that she received written counseling in February 2020, Dkt. # 37-4 at 15; she was prevented from teleworking in March 2020, *id.* at 18; and she was not assigned to an

Examination Group in April 2020, Dkt. # 37-2 at 70.[7]  It is undisputed that these events occurred eight, nine, and ten months after Plaintiff filed her original EEO complaint.

The adverse employment actions that Plaintiff identifies occurred too long after her EEO complaint to show causation, so Plaintiff does not show any "causal link" between Defendant's actions and her protected activity.  This dooms her prima facie case for retaliation.  Granted, "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).  But this is not true in all cases because "to support an inference of retaliatory motive, the [events] must have occurred 'fairly soon after the employee's protected expression.'" *Id.* (quoting *Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1009–10 (7th Cir. 2000)).  The Ninth Circuit has also noted that a gap of four, five, or eight months between protected activity and adverse action "is simply too long, by itself, to give rise to an inference of causation." *Id.* (citing *Filipovic v. K & R Express Sys., Inc.,* 176 F.3d 390, 398–99 (7th Cir. 1999) (four months); *Adusumilli v. City of Chicago,* 164 F.3d 353, 363 (7th Cir. 1998) (eight months); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir. 1998) (five months); *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir. 1997) (four months)). Here, the adverse employment actions occurred eight, nine, and ten months after Plaintiff filed her EEO complaint.  Thus, the gap between her protected activity and the adverse action is too long, by itself, to show causation.  Because Plaintiff does not offer any evidence other than timing to link her protected activity and the adverse actions, she cannot show Defendant's

---

[7] Plaintiff filed a second EEO complaint on April 19, 2020, nearly a week after she was not assigned to an Examination Group and several months after the other events took place.  *See* Dkt. ## 11-2 at 2; 37-2 at 70–72.  Because these events took place before the second complaint was filed, they similarly cannot have resulted from the protected activity.  *See Passantino*, 212 F.3d at 507.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 20

adverse employment actions were caused by her protected activity. So her prima facie retaliation claim fails.

Even if Plaintiff could link the adverse actions to her protected activity, Defendant offers legitimate reasons for the actions that it took and Plaintiff does not identify "specific" or "substantial" evidence of pretext. *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1095–96 (9th Cir. 2005) ("[W]hen the plaintiff relies on circumstantial evidence [of pretext], that evidence must be specific and substantial to defeat the employer's motion for summary judgment.") (quotation marks omitted); Dkt. # 38 at 10 (stating that Plaintiff relies on "circumstantial evidence of pretext as to the true motives for the IRS's actions and inactions here"); *see also* Dkt. # 36 at 24–27. Consequently, she cannot succeed on this claim.

## IV

### CONCLUSION

For the above reasons, the Court GRANTS Defendant's motion for summary judgment. Dkt. # 36. The Court DISMISSES Plaintiff's claims with prejudice; this includes any claim on which Plaintiff did not provide argument in opposition to the motion.

Dated this 2nd day of April 2025.

John H. Chun
United States District Judge

ORDER GRANTING MOTION FOR SUMMARY
JUDGMENT - 21